## ST. LOUIS & S. F. R. CO. v. WALTON-CHANDLER LUMBER CO.

### No. 3020. Opinion Filed December 22, 1914.

### (145 Pac. 340.)

1. **CARRIERS—Shipments—Right to Refund—Conditions Precedent.** At different dates between May 27, 1907, and February 27, 1908, plaintiff shipped rough lumber to a milling point on defendant's line of railroad. At the time a milling in transit privilege was given by defendant's tariff schedule, under which the finished product was required to be shipped out in certain quantities to destinations on said defendant's line of railroad, and under certain named tariffs carrying specified freight rates then in force. Before plaintiff shipped out any of the lumber, such schedule of rates on intrastate shipments had been canceled, and lower rates established to conform to an order of the State Corporation Commission, and thereafter plaintiff shipped under such lower rates. **Held** that, not having complied with the conditions under which the right to a refund on inbound shipments was given, plaintiff was not entitled to the benefit of it.

2. **SAME—Refund—Condition.** Plaintiff's right to a refund of the difference between the local distance tariffs paid on inbound shipments and the milling in transit or lower rate was dependent upon the shipper causing the lumber to be moved under the existing tariffs. When this was not done, but instead, the lumber was shipped out under reduced rates, put in force by lawful authority, an action to recover such refund cannot be maintained.

(Syllabus by Sharp, C.)

*Error from District Court, Choctaw County;*

*Tom D. McKeown, Assigned Judge.*

Action by the Walton-Chandler Lumber Company against the St. Louis & San Francisco Railroad Company, a corporation. Judgments for plaintiff, and defendant brings error. Reversed.

*W. F. Evans, R. A. Kleinschmidt,* and *E. H. Foster,* for plaintiff in error.

*T. C. Humphrey,* for defendant in error.

Opinion by SHARP, C.  This is an action brought by the Walton-Chandler Lumber Company, hereinafter referred to as the Lumber Company, a corporation doing a wholesale and retail lumber milling, sawing, and planing business, with offices and mills at Hugo, Okla., against the defendant, St. Louis & San Francisco Railroad Company, to recover $1,563.02, claimed by it to be due as a refund under a milling in transit arrangement accorded by a certain published tariff of defendant Railroad Company, under which, at different dates beginning May 7, 1907, and ending February 27, 1908, plaintiff, under the then corporate name of Walton-Rogers Lumber Company, made inbound shipments of rough lumber from various points in Oklahoma, over defendant's line of railway to Hugo (formerly Indian Territory, afterwards state of Oklahoma), amounting in the aggregate to 4,481,200 pounds, for resawing, planing, dressing, and reconsignment privileges.  The tariff in question was known as St. Louis & San Francisco No. 25-D.  Item 17 thereof prescribed the scale of rates which governed when reference thereto was made.  Item 18 applied the scale of rates to shipments of lumber car loads to be resawed, planed, tongued, grooved, seasoned or manufactured into vehicle and agricultural shapes, at resawing points, which included Hugo.  Item 20 concerned the application of such milling in transit rates, and provided that:

"These rates apply only when shipments of lumber to be reconsigned are billed into milling or stop-over points at local tariff rates.  The difference between local rates and the above rates will be refunded when lumber is shipped via the Frisco, the weight of lumber reshipped to be sixty-five (65) per cent. of the inbound weight."

In making said inbound shipments to Hugo, plaintiff paid freight thereon at the established and then existing rates for local shipments of rough lumber, and which rates were in excess of the rate named in item 17 of tariff 25-D.  The effect of these various provisions of the tariffs in force prior to June 26, 1907, was that the shipper was permitted to avail itself of the

published milling in transit privilege, provided it shipped into Hugo at local tariff rates, and reshipped via the Frisco 65 per cent. of the inbound weight, when the difference between local rates and the rates fixed in item 17 should be refunded to such shipper. June 26, 1907, defendant in error filed and made effective amendment No. 11 to said tariff 25-D, which made the following modification of that tariff:

"The rates named herein, unless otherwise specified, will only apply on shipments of forest products car loads, which move into milling, resawing, reconsigning or concentration points, and when the manufactured products or reshipments that have concentrating privileges are reshipped by the St. Louis & San Francisco Railroad from such milling or resawing, reconsigning, or concentrating points to destinations named in and under rates covered by tariffs Nos. 186, 200, 368, 546, 599, 900, and 904 series, but will not apply on shipments as moving between points within the state of Arkansas or between points within the state of Missouri."

As a result, then, both of tariff 25-D and amendment No. 11 thereto, shippers of rough lumber into concentrating points who paid thereon the local distance tariff rate were entitled to the benefit of the lower or milling in transit rate whenever the lumber should be manufactured and 65 per cent. thereof shipped out via the St. Louis & San Francisco Railroad Company to destinations named in and under rates covered by the tariffs named and referred to in said amendment. November 16, 1907, Oklahoma and Indian Territories were admitted into the Union as the state of Oklahoma. On March 2, 1908, the State Corporation Commission promulgated and put in force between all stations in Oklahoma a scale of rates (1st Annual Rep. Corp. Comm. pp. 226-231, which was lower than the outbound rates under the tariffs in force when the inbound shipments were made. In obedience to an order of the Corporation Commission by which it was required to enforce the rates named in said published tariffs, the Railroad Company published amendment No. 33 to tariff 25-D, by which it canceled the milling in transit privileges and rates applicable thereto on intrastate shipments,

which cancellation became effective March 2, 1908, or the same day that the Corporation Commission put in force its scale of rates. The outbound shipments of finished product from Hugo to the points named in the expense bills attached as exhibits to plaintiff's petition were all made after March 2, 1908; hence after the cancellation of the tariffs giving milling in transit privileges and rates. These outbound shipments, being intra-state, moved under the rates put in force by the State Corporation Commission, and these rates, as we have seen, materially reduced the amount of the freight charges. It was the latter rates, and not those in force at the time the inbound shipments were made, that the Lumber Company paid. It was upon the Railroad Company's offer to refund as and when provided in item 20, tariff 25-D, that the Lumber Company bases its claim. There is no dispute as to any of the material facts. It is not claimed but that all tariffs and amendments thereto were duly published and filed as required by law.

The contention of the Lumber Company is thus expressed in its brief:

"While the contention of the defendant in error is that the rate of freight paid by the defendant in error on the outbound shipments of dressed lumber is wholly immaterial and no part of the contract as it paid the amount of freight the plaintiff in error demanded and the rate in existence at the time the outbound shipments were made, and because the Corporation Commission had reduced the rate from what it was prior to state-hood on the outbound shipments, did not change the obligation of plaintiff in error to refund the excess money paid by defendant in error, when it sent out the outbound shipments to the amount of 65 per cent. in weight of the inbound shipments just the same as if there had been no statehood."

On the part of the Railroad Company it is insisted that the plaintiff is not entitled to a refund, for the reasons following: (1) Because said milling in transit arrangement had been canceled prior to the date of the movement of any outbound shipment; (2) because this court is without jurisdiction to enforce a claim depending upon a tariff not in existence at the time

the shipment moved; and (3) because, under the undisputed evidence, plaintiff has failed to comply with the conditions provided in said tariffs.

As a result of the Lumber Company's insistence, it is claimed that it is entitled to a judgment for the difference between the local distance freight rate paid on inbound shipments from points where such shipments originated to Hugo, and the milling in transit rate between said points. This difference is 4 cents per hundredweight, and, if plaintiff's contention be sound, its judgment for $1,790, including interest, should stand. But this result can only be reached by wholly leaving out of view the outbound shipments, which were a part of the milling in transit agreement. It is not claimed by the Lumber Company, but rather conceded, that it would not be entitled to a refund unless upon the outbound shipment via the Frisco of 65 per cent. of the inbound tonnage. This is true, but, alone, is not sufficient. The outbound shipments to the extent indicated, via the Frisco, were not only to be made, but were to be under rates covered by tariffs 186, 200, 368, 546, 599, 900, and 904 series. Plaintiff's outbound shipments, while made to the extent, and probably to destinations, named in said tariffs, were not made under the tariffs in force when the inbound shipments were made; and the refund was not due the Lumber Company, unless the shipments were made under the then existing tariffs. In other words, the milling in transit rate was an entirety, and its provisions must be accepted and carried out in its entirety, or not at all. Such was the conclusion reached by the Circuit Court of Appeals, in *Carson Lumber Co. v. St. Louis & S. F. R. Co.*, 209 Fed. 191, 126 C. C. A. 139, a case arising in the United States Court for the Eastern District of Oklahoma, and wherein the facts appear to be the same as in the case under consideration. It was there said, with reference to the milling in transit rate:

"It is applicable only when all its substantial terms and provisions are observed. The railroad, in tendering such a privilege, undoubtedly relies upon the revenues which it expects

will accrue from such a traffic arrangement. These depend upon the terms and conditions of the tariffs then in force. An inspection of those in effect when those inbound shipments moved make it apparent that, to entitle a shipper to refund, he must not only pay the existing local tariff rates upon inbound shipments, but must thereafter bill out under prescribed outbound rates. If the shipper pays less than the outbound rate in force when his inbound shipment was made, he has not complied with the excess terms of the tariff, nor has the carrier received the full rate which induced it to concede the milling in transit privilege.  *  *  *  Therefore it has not complied, either in letter or in spirit, with the terms and conditions of the tariffs upon which its cause of action is based."

The opinion of the trial court, reported in (D. C.) 198 Fed. 311, after setting out *in extenso* the history of the cause of action, announced the following rule:

"Freight rates are not the subject of contract; they are the creatures of the law and of those charged with its administration. If it were otherwise, a very low milling in transit rate might be established at the instance of some favored shipper without limitation of time as to the outbound movements, and when he had completed his inbound movements the rate might then be raised by lawful process, the result of which would be that the favored shipper would thus secure for an indefinite period of time a vested right to the application of the low rate to both inbound and outbound shipments, while other shippers would be required to pay the higher rate. It is well settled such contracts of shipment entered into between the shipper and the carrier may not be enforced in the face of a published tariff rate for the service."

No question of bad faith is charged against the Railroad Company in the cancellation of its milling in transit privileges and rates. On the admission of Oklahoma into the Union as a state, the jurisdiction of the general government and of the Interstate Commerce Commission over local rates within the state ceased and the jurisdiction thus relinquished was taken up and exercised by the state authorities. The state put into effect a new schedule of rates applicable to the outbound movements in question, and those rates became the only lawful charge therefor. It results, therefore, that plaintiff paid the lawful rates

then in effect upon the inbound movements, and the lawful rates in effect upon outbound movements, and therefore it has no complaint as to shipments in controversy, which had both origin and destination within the state. The Lumber Company was charged with notice that the milling in transit privileges and rates were subject to change in the manner provided by law. In *Armour Packing Co. v. United States,* 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681, it was held that a shipper was guilty of accepting transportation at less than the carrier's published rates, in violation of the Elkin's Act of February 19, 1903 (U. S. Comp. St. 1913, secs. 8597-8599), where, after the carrier had duly established a higher rate, he secured such transportation at the rate agreed upon in a prior contract with the carrier, which was the legal, published, and filed rate when the contract was made, since the statute, being then in force, was read into such contract, and became a part of it. It was said, in disposing of this contention:

"It may be, as urged by petitioner, that this construction renders impossible the making of contracts for the future delivery of such merchandise as the petitioner deals in, and that the instability of the rate introduces a factor of uncertainty, destructive of contract rights heretofore enjoyed in such property. This feature of the law, it is insisted, puts the shipper in many kinds of trade at the mercy of the carrier, who may arbitrarily change a rate upon the faith of which contracts have been entered into. But the right to make such regulations is inherent in the power of Congress to legislate respecting interstate commerce, and such considerations of inconvenience or hardship address themselves to the lawmaking branch of the government. *New York, N. H. & H. R. Co. v. Interstate Commerce Commission,* 200 U. S. 399, 26 Sup. Ct. 272, 50 L. Ed. 524. It may be that such contracts should be recognized, giving stability to rates for limited periods; that, the contracts being filed and published, and the rate stipulated known and open to all, no injustice would be done. But, as we have said, such considerations address themselves to Congress, not to the courts. It is the province of the judiciary to enforce laws constitutionally enacted; not to make them to suit their own views of propriety or justice. The statute, being within the constitutional power of Congress, and being in force when the contract was made,

is read into the contract and becomes a part of it. If the shipper sees fit to make a contract covering a definite period, for a rate in force at the time, he must be taken to have done so subject to the possible change of the published rate in the manner fixed by statute, to which he must conform or suffer the penalty fixed by law."

We believe that the courts have uniformly held that contracts for interstate transportation at special rates, though antedating the enactment of the federal Interstate Commerce Act, forbidding discrimination in freight rates, became invalid upon enactment of the statute. *Southern Wire Co. v. St. Louis Bridge & Tunnel R. Co.*, 38 Mo. App. 191; *Fitzgerald v. Grand Trunk R. Co.*, 63 Vt. 169, 22 Atl. 76, 13 L. R. A. 70; *Fitzgerald v. Fitzgerald & M. Construction Co.*, 41 Neb. 374, 59 N. W. 838; *Bullard v. Northern Pac. R. Co.*, 10 Mont. 168, 25 Pac. 120, 11 L. R. A. 246. The Lumber Company's misfortunes came about in not availing itself of the milling in transit privilege while in effect, and in waiting until after the rate had been canceled. This loss, however, it appears was largely, if not wholly, compensated by the reduced rate under which it was enabled to make its outbound shipments. It did not pay, neither could the Railroad Company have continued to charge, the original outbound rates, as fixed in the tariffs and amendments thereto, the same having prior thereto been cancelled.

The judgment of the trial court should be reversed.

By the Court: It is so ordered.