MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY, Appellant, vs. MENASHA WOODEN WARE COMPANY, Respondent.

*November 19—December 8, 1914.*

*Railroads: Regulation of rates by state: Revocation of power granted to companies: Statute construed: Prior special contracts superseded: Constitutional law: Impairing obligation of contracts.*

1. Under the Railroad Commission Law (ch. 362, Laws of 1905; secs. 1797—1 to 1797—36, Stats.) railroad rates within the state must be reasonable, just, and nondiscriminating, and apply to all shippers alike within the territory and for the commodity covered by the tariff rates.
2. The power to regulate the compensation to be paid for their services, granted to railroad companies by sub. 9, sec. 1828, Stats. 1898, was subject to the right of the state to amend or annul it; and all contracts made pursuant thereto by railroad companies were subject to be superseded whenever the state should resume the exercise of its sovereign power to regulate rates.
3. When, therefore, pursuant to the Railroad Commission Law, a railway company filed its tariffs covering rates for the transportation of freight as to which a special contract then existed, such contract became inoperative.
4. In so far as there is language in the opinion in *Superior v. Douglas Co. T. Co.* 141 Wis. 363, to the effect that a contract for a public utility rate made prior to the passage of the Public Utility Law would be saved by the constitutional prohibition against laws impairing the obligation of contracts, irrespective of sec. 1797*m*—91, Stats., it is disapproved.
5. That part of sec. 1797—6, Stats., providing that nothing in the Railroad Commission Act shall be construed to prevent "transit

and other special contract rates," refers to rates to be made thereafter under the supervision and regulation of the commission and complying with the requirements of that section, and does not relate to special contracts existing at the time the law took effect.

MARSHALL, J., dissents.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Reversed.*

Action to recover the tariff freight charges on carload shipments of logs and wood bolts from various points in the state to Ladysmith carried over plaintiff's road between June 1, 1911, and March 1, 1912. So far as affecting any question decided upon the appeal the facts are these: On December 15, 1899, the parties entered into a contract in the form of an offer and acceptance which read:

"That in consideration of your making us a rate of 3c per hundred pounds, minimum of 30,000 pounds on staves and heading from Warner to Prentice and $3 per car on logs and bolts from McCord to Warner and the same rate west of Warner as far as McCord is east of Warner on logs and bolts, with the understanding that the freight on lumber to general markets from Warner will not average any higher than that from Chippewa Falls and that any of our pine timber that we have between Gagen and Rhinelander, you will be willing to haul to either Prentice or Pembine at $1 per thousand. Minimum on logs 5,000 feet per car and on bolts twelve cords per car.

"We propose to put in a mill as soon as it can be done in the spring at Warner. This, of course, is with the understanding that you will put in the necessary sidings for our mill at Warner and sidings where we desire to make shipments of logs and bolts where shipments would warrant, the understanding being that we furnish the right of way, grading and ties.

"The above rates are to hold good as long as we own and operate the mill at Warner."

Warner is now called Ladysmith and McCord is about sixty miles east of Ladysmith. The rate named in the contract was observed by the parties until June 1, 1911, except that

132    SUPREME COURT OF WISCONSIN.    [Dec.

Minneapolis, St. P. & S. S. M. R. Co. v. Menasha W. W. Co. 159 Wis. 130.

from 1907 defendant paid $4 per car, because of the increased size of cars in common use.    This modification was consented to by both parties as a proper construction of the contract. February 27, 1911, the plaintiff sent notice to defendant that tariffs covering the shipments in question would be filed with the Wisconsin railroad commission and freight charged pursuant to the tariffs and not under the contract.    Subsequently tariffs were filed with the Wisconsin railroad commission covering the period between June 1, 1911, and March 1, 1912. These tariffs placed all Wisconsin shippers on the same basis, and exceeded the contract price, but provided for only a reasonable rate.

Plaintiff claims the contract was superseded by the Wisconsin Railroad Commission Law and by the tariffs filed pursuant thereto.    The defendant claims the contract is still in force and controls the price that it should pay.    The circuit court held that the contract was still in force and governed the freight rate, and it entered a judgment in favor of plaintiff for the freight due under the contract, to wit, $113.09, instead of for the sum of $3,217.04, due under the tariffs, and enjoined plaintiff from refusing to haul under the contract rate.    From such judgment the plaintiff appealed.

For the appellant there was a brief by *Silas Bullard, W. A. Hayes,* and *Kenneth Taylor,* attorneys, and *Alfred H. Bright,* of counsel, and oral argument by *Mr. Taylor* and *Mr. Bright.*

For the respondent there was a brief by *Thompson, Thompson & Jackson,* and oral argument by *J. C. Thompson.*

VINJE, J.    That it was the avowed purpose of ch. 362, Laws of 1905 (secs. 1797—1 to 1797—36, Stats.), and the acts amendatory thereof, known as the Wisconsin Railroad Commission Act, to secure nondiscriminating, just, and reasonable rates for all services rendered by railroads as common carriers of persons and property within the state is so plain

from the language of the act as not to admit of serious doubt. Sec. 1797—3 provides:

"Every railroad is hereby required to furnish reasonably adequate service and facilities, and the charges made for any service rendered or to be rendered in the transportation of passengers or property or for any service in connection therewith, or for the receiving, switching, delivering, storing or handling of such property, shall be reasonable and just, and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful."

Sec. 1797—23 declares any undue or unreasonable preference or advantage or disadvantage to any person, firm, or corporation unlawful and prohibits the same; and sec. 1797—24 penalizes rebates, concessions, or discriminations in respect to the transportation of any property within the state. Treble damages are provided for in behalf of the person, firm, or corporation injured thereby in addition to the penalty accruing to the state. Sec. 1797—25. These provisions taken in connection with the whole scheme of the act unmistakably point to the conclusion that railroad rates within the state should, after the act took effect, be reasonable, nondiscriminating, and apply to all shippers alike within the territory and for the commodity covered by the tariff rates.

The question therefore arises whether or not the contract between the parties was superseded by the Railroad Commission Act and the filing of tariffs affecting the freight in question in accordance with the provisions of such act. The defendant claims that its contract was in no wise affected by the enactment of the act and the filing by plaintiff of tariffs thereunder, because the contract, being valid when made, could not by reason of the provisions of the federal and state constitutions prohibiting the passage of any law impairing the obligations of contracts be invalidated by any legislative act. And it relies especially upon the case of *Superior v. Douglas Co. T. Co.* 141 Wis. 363, 122 N. W. 1023, as being decisive

of the correctness of the position taken. It further claims that in any event sec. 1797—6 saves the contract, because that section in its terms saves transit and special contract rates.

Does the Railroad Commission Act, irrespective of sec. 1797—6, and the filing of tariffs thereunder covering the transportation provided for in the contract supersede it? That it would be superseded except for the constitutional provisions above referred to is quite plain. The act provided that the lowest schedule of rates in force in April, 1905, should constitute the lawful schedule of rates until changed by the filing of other tariffs. Sec. 1797—35. Sec. 1797—4 makes it the duty of every railroad to file with the commission a full schedule of rates in force for all services rendered by it within the state. And sub. (c) thereof declared:

"It shall be unlawful for any railroad to charge, demand, collect or receive a greater or less compensation for the transportation of passengers or property or for any service in connection therewith than is specified in such printed schedules, including schedules of joint rates, as may at the time be in force, and the rates, fares and charges named therein shall be the lawful rates, fares and charges until the same are changed as herein provided."

So it is plain as stated in *Frank A. Graham Ice Co. v. C., M. & St. P. R. Co.* 153 Wis. 145, 140 N. W. 1097, that the legislature intended to and did provide for an exclusive method of fixing freight rates, in so far as it could constitutionally do so.

The contract relied upon by the defendant was entered into pursuant to the provisions of sub. 9 of sec. 1828, Stats. 1898, which gave the railroad company the right to regulate the compensation to be paid for transporting passengers and property, and it is conceded by plaintiff that it was valid when made. The corporate power thus granted to the plaintiff to regulate the compensation to be paid for its services was granted subject to the right of the state to amend or annul it.

There was no absolute irrevocable grant of power to the railroad company to forever regulate rates, but only a grant of power to be exercised by it until modified, amended, or resumed by the state. The power to regulate the rates of common carriers is a sovereign power of the state. *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592, 142 N. W. 491. And every contract made as to such rates with a corporation authorized to contract in reference thereto is made with the knowledge of and subject to the right of the state at any time to resume the exercise of such sovereign power. The legislative right to supersede it is as clear as though it were written into the contract itself, for the law implies it. This was expressly held in *Milwaukee E. R. & L. Co. v. Railroad Comm., supra,* and as there stated was involved in the decision in *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925, only in the latter case it was held the state had not exercised its power to act. To construe sub. 9 of sec. 1828, Stats. 1898, as authorizing railroad companies to make contracts for rates binding upon the state when it resumes its rate-making power would be to hold that the legislature could part with an attribute of sovereignty. This it cannot do. In a democracy there can be no abdication. Sovereignty is not subject to a perpetual gift, grant, or barter. A perpetual grant *under* sovereign power may be made, but not a perpetual grant *of* sovereign power. The railroad company was but an agency of the state in regulating rates, and as such it had no authority to enter into a contract not subject to modification or revocation by the state. *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925; *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530; *Kenosha v. Kenosha H. T. Co.* 149 Wis. 338, 135 N. W. 848. Federal authorities are to the same effect. It has been uniformly held by the supreme court of the United States that contracts between private parties and common carriers fixing compensation to be paid for transportation, though made under state or federal

authority, are made subject to the right of the state or of Congress to modify or annul them under their sovereign power to regulate rates.    *Georgia R. & B. Co. v. Smith,* 128 U. S. 174, 9 Sup. Ct. 47; *Armour P. Co. v. U. S.* 209 U. S. 56, 28 Sup. Ct. 428; *Louisville & N. R. Co. v. Mottley,* 219 U. S. 467, 31 Sup. Ct. 265; *Portland R., L. & P. Co. v. Railroad Comm.* 229 U. S. 397, 33 Sup. Ct. 820.    To the same effect is *Seaman v. M. & R. R. R. Co.* (Minn.) 149 N. W. 134, a case almost identical with the one at bar.

As pointed out in *Kenosha v. Kenosha H. T. Co.* 149 Wis. 338, 135 N. W. 848, the contract in the case of *Superior v. Douglas Co. T. Co.* 141 Wis. 363, 122 N. W. 1023, was in fact saved by the provisions of sec. 1797m—91 exempting existing contracts from the provisions of the Public Utility Act as to discrimination, whether or not the opinion in the case based it upon that ground.    In so far as there is language in that opinion to the effect that a contract for a public utility rate made prior to the passage of the Public Utility Law would be saved by the constitutional prohibition against laws impairing the obligations of contracts, irrespective of the exempting part of the law referred to, it is disapproved.

When the plaintiff filed its tariffs covering the freight rates for the transportation of the freight included in the contract, the latter became inoperative.    The state had then, through the instrumentality and by the method by it prescribed, fixed another rate which became the only lawful rate till changed as provided for in the act.    There was no change made in the tariffs filed during the period the freight in question was transported.

Sec. 1797—6 provides:

"Nothing in sections 1797—1 to 1797—38, inclusive, shall be construed to prevent concentration, commodity, transit and other special contract rates, but all such rates shall be open to all shippers for a like kind of traffic under similar circumstances and conditions, and shall be subject to the provisions

of sections 1797—1 to 1797—38, inclusive, as to the printing and filing of the same. Provided, all such rates shall be under the supervision and regulation of the commission."

The claim that this contract is saved under the clause "transit and other special contract rates" is not well taken. The section quoted refers to rates made in the future under the supervision and regulation of the commission and complying with the requirements of the section. It does not relate to special contracts existing at the time the law took effect. The very purpose of the act was to abolish all existing private, secret, and special contracts and traffic arrangements and to place all shippers in future upon an equality so far as practicable. The abuses under the old system consisted chiefly in favored shippers and favored localities, resulting in discriminations and inequalities enabling the favored shippers to crush competition and the favored localities to thrive at the expense of those less favored. These were some of the more important abuses the act sought to abolish. Its effect would in a large measure be rendered nugatory had existing contracts and tariff agreements been preserved. In order to strike at the root of the evil it was necessary for the state to resume full control of its rate-regulating power and to start with a clean slate. This it did by providing that in future all railroad transportation rates within the state should be under the supervision and control of the commission, subject to the provisions of law relative thereto. As to the invalidity generally of contracts inconsistent with published tariffs, see 4 Ruling Case Law, 603 *et seq.* and cases cited.

The circuit court should have entered judgment for the amount of the tariff rate, viz. $3,217.04, less any payments made thereon, with interest on such sum from March 16, 1912, the time of the commencement of the action.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment as indicated in the opinion.

The following opinion was filed January 8, 1915:

MARSHALL, J. (*dissenting*).    For reasons I stated in *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592, 630, 142 N. W. 491, I cannot agree to the decision here.    Such decision, naturally, though not necessarily, follows from the logic of the former case, the infirmity of which I sought to point out and which was likewise exhibited, as I think, in the opinion of Mr. Justice TIMLIN, though by a line of reasoning of his own he was able to concur in the result.    I shall continue to dissent from the majority view before, until it shall have been passed upon by the federal supreme court, which I firmly believe will result in its being condemned.

There is no more important feature of our constitutional system than the one prohibiting legislation impairing the obligations of contracts.    This court has vindicated such feature over and over again.    It extends to corporations as well as individuals.    There is no difference, as has often been held and is clearly pointed out by abundance of authority in the opinion of Mr. Justice TIMLIN referred to, as well as in my own.

True, there is the reserved power to alter or amend corporate charters, though contractual in nature, but that does not extend further than the corporate grant which is conditioned upon such power.    It does not justify supersession of existing business contracts, legitimately made upon consideration parted with.    It does not justify confiscation of property, tangible or intangible.    It does not extend to and authorize impairment of any ordinary business contract,—any not inhering in and essentially a part of the corporate privilege, as this court has heretofore held.    Those contracts are just as sacred,—just as clearly within fundamental protection,—as contracts between individuals.    The one involved in this case is, to my mind, clearly of that nature and, as I

before understood the view of the court, and understand it now, this far it coincides with my own. But a new idea was advanced in the former case, and rules now as seems to me,—one which supersedes and throws into discard all heretofore said in this and other courts since the decision in *Dartmouth College v. Woodward,* 4 Wheat. 518.

The novel idea, as I understand it, is that there is an inherent power,—one above the constitution, so to speak, or, at least, not limited by it, state or national, to deal at pleasure with corporate contracts though made under the usual power to do what an individual might lawfully do in conducting the same or similar business. It will be discovered that my brother TIMLIN industriously sought, and to his satisfaction found, a pathway, consistent with the logic of the *Dartmouth College Case,* to reach the conclusion pronounced before, as a condition of concurring with it.

Had the instrumentalities so positively asserted before and applied now, been efficiently thought of in *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, it would not have been deemed necessary, or even feasible, to reach the conclusion which so logically, as was thought, could only be seen through the vista of reserved power to alter or amend corporate charters.

I think I do not misunderstand the effect of the former decision. It is to the effect that the state possesses the sovereign power to fix the compensation which a public utility corporation may demand for service, superseding existing contracts containing all essential elements of mutuality as to promises; and even characterized by a paid consideration upon one side to be compensated for *in futuro;* that the exercise of such power does not need the aid, nor fall within the purview, of the fundamental reserved power to alter or amend corporate charters. No authority is cited to support that doctrine. It seems to rest on the idea that changed conditions may give rise to legitimate judicial modification or change of

the unwritten law, and call for assertion of a principle by which the prohibition against impairing the obligation of contracts may be rendered dominant.

I have thought best to express myself here in general terms, without citation of authority. Reference to my opinion and that of Mr. Justice TIMLIN in the former case will furnish ample in the matter of illustration.

There is no point where there has been greater effort to securely intrench rights than that relating to contracts. We see that in the Northwest Ordinance which preceded the national constitution, and again in the latter, in the form of a prohibition upon the power of the states, and again in our state constitution, in the form of a limitation of legislative power.

It is also within the broad guaranty upon which our whole constitutional fabric was constructed. There is no exception other than under the reserved power. Whatever measure of inherent power to interfere, destructively, with the obligations of contracts, is possessed by the lawmaking power, as an original matter, is limited by the fundamental law the same as the police power, which at one time was thought to be above constitutional restraint.

This case furnishes a striking illustration of the harmful effect of the new doctrine. The respondent, in effect, bought and paid for the privilege it claims. The interference is not with the power to make contracts, nor power to execute existing contracts which have been fully satisfied up to date, so that nullifying them cannot work hardship by taking away, without consideration, a valuable purchased right; but with a property right acquired, contractually, for a consideration parted with,—a right which is as essentially property as any tangible thing respecting invested capital. Such property is confiscated in fact. That is the real effect of the doctrine upon which the decision in this case is grounded.