# Kentucky Traction & Terminal Company v. Murray, et al.

### (Decided June 22, 1917.)

## Appeal from Franklin Circuit Court.

1. Carriers—Contract for Issuance of Pass.—Statute—Pleading.—In an action to compel renewal and issuance by a railroad company of an annual pass authorizing free transportation to the plaintiff and his family on its cars, on the grounds that the defendant in part consideration for a right of way through his lands for its railroad track conveyed it by plaintiff in 1894, agreed to furnish him and his family free transportation for life over its lines and to issue to them annually a pass or passes for that purpose, the answer of the defendant admitted the contract and its willingness to still comply with its terms, but alleged the abrogation of the contract by the anti-pass statute enacted by the legislature of Kentucky, February 10th, 1916, which prohibited the defendant from continuing to furnish plaintiff and his family with free transportation longer than January 1st, 1917, and from issuing to him a pass after that date; held, that the answer presented a good defense; hence, the action of the circuit court in sustaining a demurrer thereto was error.

2. Constitutional Law—Anti-Pass Act.—It is the object of section 196, constitution, to prevent unjust discrimination in the transportation of freight and passengers by a common carrier; hence, it may be said to declare the public policy of the State on that subject; and as its provisions were in force when the contract under which the plaintiff demands the free transportation of the common carrier, was made, the contracting parties had knowledge of the power of the State, through its legislature, to enforce them. Therefore, the provisions of the constitution entered into and became a part of the contract at its inception; and its terms and obligations were at all times subject to the power of the leglislature to pass laws in pursuance of the constitutional provisions. Hence, when the anti-pass law enacted subsequently to the making of the contract, took effect the contract became illegal, and no

longer of any binding effect. For the reasons mentioned the anti-pass act is not repugnant to article 1, section 10, constitution, United States, prohibiting impairment of the obligation of a contract.

3. Constitutional Law—Statutes—Anti-Pass Act—Contracts—Police Regulation.—The anti-pass law is simply a police regulation enacted in pursuance to the mandate of the constitution. The act defines unjust discrimination in terms that outlaw the contract in question, section 4 thereof declaring: "Free pass or free transportation, as used in this act, shall include any ticket, pass contract, permit or transportation issued, furnished or given to any person by any common carrier of passengers or passage for any other consideration than money paid in the usual way, at the same rate of sale or change open to all who desire to purchase, and shall include any tickets sold at reduced rates in common to all of the public. . . ."

RICHARD C. STOLL, GUY H. BRIGGS and W. H. TOWNSEND for appellant.

T. L. EDELEN for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE SETTLE— Reversing.

May 15, 1894, the appellee, James A. Murray, and his wife, by deed executed to the Capital Railway Company, a corporation created under the laws of Kentucky, and then owning and operating a street railway in the city of Frankfort and suburbs, conveyed to it the right of way through and over a body of land contiguous to the city of Frankfort, owned by them. A part of the consideration for this conveyance was the right to the appellee and his family to travel upon the cars of the railway company without other or further payment of fare. After this conveyance was made, the Capital Railway Company sold and conveyed its railway lines, cars and franchise to the appellant, Kentucky Traction & Terminal Company, which has since owned and operated the street railway in the city of Frankfort and suburbs, and, in addition, a trolley line running from Frankfort to Versailles, thence to Lexington, and therefrom to other contiguous cities. When it purchased and became the owner of the street railway franchise and other property of the Capital Railway Company, appellant assumed the undertaking of the contract of that company to furnish appellee and members of his family with free transportation over its lines of railway; and, in pursuance thereof, annually issued to him and them a pass or passes under

and by virtue of which he and they received and enjoyed such free transportation until about December 1, 1916, at which time appellees received from appellant a written notice informing them that from and after the 1st of January, 1917, it would decline and refuse to further furnish him and his family free transportation over its railway lines, or to issue to him or them a pass or passes for that purpose; giving as a reason therefor, the passage by the General Assembly of Kentucky of the act known as the Anti-Pass Law, which declares it to be unlawful for a common carrier of passengers in this state to give, on or after January 1, 1917, to any person a free pass or free transportation over its lines. (See Acts 1916, page 1.) Shortly after receiving this notice, the appellee, individually and as trustee for the members of his family, brought this action in the Franklin circuit court against the appellant for a mandatory injunction to compel compliance on its part with the contract contained in the deed of May 15, 1894, made by the appellee, James A. Murray, and his wife, to its predecessor, the Capital Railway Company, and later assumed by appellant, to furnish them free transportation over its lines of railway, and to issue to appellee and his family a pass or passes affording such right. The appellant filed a demurrer to the petition, which was overruled. It then filed an answer, which presented no issue of fact, but denied the allegations of the petition that the act of February 10, 1916, known as the Anti-Pass Law, is invalid insofar as it impairs the validity of the appellee's contract with its predecessor, or that the act, insofar as it applies to the contract, is violative of the constitution of the United States, section 10, article 1; and closed with the following averments:

"The defendant says that it is true that it and its predecessor pursuant to said contract have issued to plaintiffs annually a free pass over the city railway in the city of Frankfort for his individual use and the members of his family, but it says that by virtue of the provisions of the act of the General Assembly of Kentucky, approved February 10, 1916, referred to in plaintiff's petition, the defendant is prohibited from issuing said pass to the plaintiffs after January 1st, 1917; and because of said prohibition and only because thereof, has the defendant declined, and will continue to decline, to issue said free passes. The defendant denies that the said act is in violation of section 10, article 1, of the Constitution of the United States."

596 KENTUCKY REPORTS. [Vol. 176.

Appellees filed a demurrer to the answer, which the court sustained, and the appellant refusing to plead further, the court, by the judgment rendered, granted the mandatory injunction prayed by appellees, compelling appellant to forthwith issue and deliver to the appellee, James A. Murray, and his family, passes authorizing him and them to ride without the payment of fare upon its lines; and, in addition, awarded to appellees their costs expended in the action. Appellant's dissatisfaction with that judgment resulted in this appeal.

It will be observed that no issue of fact is presented by the pleadings and it is admitted by appellant that but for the passage of the Anti-Pass Act of 1916 it would have continued to furnish to appellee, Murray, and the members of his family free transportation in compliance with the terms of the contract made by its predecessor, and issue them annual passes for that purpose.

It is contended by counsel for appellees: (1) That there was no public policy of this state prior to the enactment of the anti-pass statute which prevented a common carrier from making a contract, for a valuable consideration, granting free transportation to a citizen. (2) That there has been no such public policy since the enactment of the present constitution, in the absence of a showing of unjust discrimination. We cannot sustain the first of these contentions, but in a qualified sense, as later indicated in the opinion, concur in the second. The present constitution of Kentucky, which was adopted prior to the making of the contract under which appellees assert right to the free transportation demanded of appellant, and was, of course, in force prior to the enactment of the Anti-Pass Law, by both sections 196 and 197, declare the public policy of the state on this subject and make such contracts as that relied on by appellees, contrary thereto. Section 196 provides:

"Transportation of freight and passengers by railroad, steamboat or other common carrier, shall be so regulated by general law as to prevent unjust discrimination. No common carrier shall be permitted to contract for relief from its common law liability."

By section 197 it is provided:

"No railroad, steamboat or other common carrier, under penalty to be fixed by the General Assembly, shall give a free pass or passes, or shall at reduced rates not common to the public sell tickets for transportation to any state, district, city, town or county officer, or mem-

ber of the General Assembly; and any state, district, city, town or county officer or member of the General Assembly, or judge, who shall accept or use a free pass or passes, or shall receive or use tickets or transportation at reduced rates not common to the public, shall forfeit his office. It shall be the duty of the General Assembly to enforce the provisions of this section."

If the free transportation appellees have enjoyed under the contract in question is "unjust discrimination" in the meaning of section 196, constitution, it is and was, when made, against the public policy of the state, as declared by that section, and whether it is unjust discrimination, must be determined by the meaning required to be given those words by a reasonable interpretation of them. In our opinion, any illegal discrimination is unjust; and where everyone is not treated alike under substantially similar conditions by a common carrier, this under the law constitutes discrimination, which by reason of its very inequality, is illegal or unjust. But we need go no further than to the Anti-Pass Law itself for the meaning of the words "unjust discrimination." Section 1 of the act makes it unlawful for a common carrier of passengers in this state to give to any person any free pass or free transportation. Section 4 of the act gives the definition we are seeking, for it provides:

"Free pass or free transportation, as used in this act, shall include any ticket, pass, contract, permit or transportation issued, furnished or given to any person by any common carrier of passengers, or passage for any other consideration than money paid in the usual way, at the same rate of sale or charge open to all who desire to purchase, and shall include any ticket sold at reduced rate in common to all of the public . . . ."

It is, however, argued by appellees' counsel that such a contract as is here involved was held valid under the laws of this state in L. & N. R. R. Co. v. Mottley, 133 Ky. 652, and that for the reasons therein given the contract here involved cannot be declared invalid. The history of that case is correctly given by counsel. The principal question involved was whether the contract made in 1871 by the railroad company with Mottley and his wife, whereby, in consideration of its release by them from all damages on account of personal injuries, the railroad company agreed to issue to each of them annually during life a railroad pass authorizing free transportation over its lines, was violative of sections 1 and 2 of the

act of Congress of June 29th, 1906, regulating interstate commerce; the first, prohibiting common carriers engaged in such commerce from giving free transportation or free passage after January 1st, 1907; and the second section requiring the publication of passenger and freight rates and prohibiting discrimination in such rates, &c. It was held by this court that as the contract was made before the passage of the act, and the act was not intended to have a retrospective effect, its provisions forbidding discrimination in rates, were not violated. It was not held in the Mottley case that the contract was not contrary to the public policy of the state, though this might properly have been declared as the provisions of our present constitution found in sections 196 and 197, defining the public policy of the state with reference to such contracts, were not in existence when that contract was made.

It should, however, be remarked that when the case of Louisville & Nashville Railroad Company v. Mottley was carried by writ of error to the Supreme Court of the United States, the judgment of this court was reversed; that court holding that the contract by which the railroad company undertook to issue annually passes for life to Mottley and wife, in consideration of the release of their claims for damages, though entered into prior to the act of June 29th, 1906, was made unenforceable by the provisions thereof against demanding, collecting, or receiving "a greater or less or different compensation" for the transportation of persons or property, or for any services in connection therewith, more than specified in the carrier's published schedule of rates. In other words, it was held that Congress in the exercise of its power over interstate commerce, had the right to enact the statute of June 29th, 1906, which rendered unenforceable the prior contract between the railroad and Mottley, though such contract when made was otherwise valid. The distinction between the Mottley case and the instant case is that when the Mottley contract was made there was in existence no public policy of the state forbidding the making of such a contract, but when the contract in the instant case was made, such public policy was in force by virtue of the existence of sections 196 and 197 of our constitution.

It is a further contention of appellees that if the anti-pass law prohibits the issual to appellees of the

passes authorizing free transportation over appellant's lines, provided for in their contract with appellant, that the obligation of the contract must be held thereby impaired. Hence, the Anti-Pass Law is violative of section 10, article 1, Constitution of the United States. This contention ignores two important facts: (1) That the enactment by the legislature of the Anti-Pass Statute was directed by sections 196, 197, Constitution. (2) That the state under its police power has a right to regulate charges for transportation of both passengers and property, and also to prevent unjust discrimination in charges for such transportation. Railroads are creatures of the law, owing certain well defined duties to the public. One of the highest of these duties is that they must serve all alike. They may not, therefore, serve a favored few at the expense of the many. The title "common carrier" by which the railroad is known to the law implies the equality of the service required of it. If the railroad is permitted to carry free of charge one or a few, others who pay for transportation must contribute their part of the cost of transporting the free passengers; and it is not to be overlooked that the act requires that all transportation, except that furnished in exchange for advertising, must be paid for in money.

The provisions of the sections of the constitution, *supra,* and those of the Anti-Pass Act are but declaratory of the common law which now, as in the past, forbids all discrimination as between applicants who request the same service. As well said in Wyman on Public Service Corporations:

"This is the modern view reached after some bitter experiences with the results of discriminations by the railroads in disturbing the normal industrial order, in suppressing competition and fostering monopoly . . . . In the leading case of Messenger v. Pennsylvania Railroad Company, 36 N. J. Law, Mr. Justice Beasley said in part: 'Recognizing this as the settled doctrine, I am not able to see how it can be admissible for a common carrier to demand a different hire from various persons for an identical kind of service, under identical conditions. Such partiality is legitimate in private business, but how can it square with the obligations of a public employment? A person having a public duty to discharge, is undoubtedly bound to exercise such office for

the equal benefit of all, and, therefore, to permit the common carrier to charge various prices, according to the person with whom he deals, for the same services, is to forget that he owes a duty to the community. If he exacts different rates for the carriage of goods of the same kind between the same points, he violates, as plainly, though it may be not in the same degree, the principle of public policy which, in his own despite, converts his business into a public employment. The law that forbids him to make any discrimination in favor of the goods of A over the goods of B, when the goods of both are tendered for carriage, must, it seems to me, necessarily forbid any discrimination with respect to the rate of pay for the carriage.' "

United States v. Hocking Valley Railroad Company, 194 Fed. 234;

We are unable to see that the refusal of the relief sought by appellees will constitute such an impairment of the obligation of the contract here involved as would violate article 1, section 10, Constitution, United States. The right of the state to enforce the provisions of its constitution and those of its statutes enacted in pursuance thereto, looking to the proper exercise of its police power, cannot be questioned and those provisions are to be considered as carried into and made a part of every contract between a common carrier and an individual. The contention of appellee that the contract was valid when made and that its performance is enforceable, notwithstanding the subsequent enactment of the Anti-Pass Law, therefore, disregards the fundamental rule of the interpretation of contracts referred to, viz.: That all laws in existence when the contract is made or thereafter enacted in pursuance of the police power of the state, necessarily enter into and form a part of it as fully as if they were expressly incorporated into its terms. This principle is supported by a long line of authorities. An excellent statement of it will be found in Pinney & Boyle v. Los Angeles Gas & Electric Corporation, 141 Pacific 620:

"A word, perhaps, should be added touching the asserted violation of the provision of the contract between the company and plaintiff by enforcement of the terms of the regulatory ordinance. Upon this it is sufficient to say it will be conclusively presumed that the parties contracted in contemplation of the power of the proper board or tribunal to fix rates in every case where such

power exists and may have been thereafter legally exercised. L. & N. R. R. v. Mottley, 219 U. S. 467; Seattle v. Hurst, 50 Wash. 424; Portland R. Light & P. Co. v. Railroad Commission, 56 Ore. 468; Knoxville Water. Co. v. Knoxville, 189 U. S. 434.''

Under this rule appellees and appellant's predecessor must be presumed to have contracted in contemplation of section 196 of the constitution, and of the power of the legislature to enact the Anti-Pass Law. In C. B. & Q. R. R. Co. v. Omaha, 170 U. S. 67, it is said:

''Usually, where a contract not contrary to public policy, has been entered into between parties competent to contract, it is not within the power of either party to withdraw from its terms without the consent of the other; and the obligation of such a contract is constitutionally protected from hostile legislation. Where, however, the representative parties are not private persons dealing with matters and things in which the public has no concern, but are persons or corporations whose rights and powers were created for public purposes, by legislative acts, and where the subject matter of the contract is one which affects the safety and welfare of the public, other principles apply. Contracts of the latter description are allowed to be within the supervising power and control of the legislature when exercised to protect the public safety, health, and morals, and that clause of the Federal Constitution, which protects contracts from legislative action cannot in every case be invoked. The presumption is that when public contracts are entered into it is with the knowledge that parties cannot by making agreements on subjects involving the rights of the public withdraw such charges from the police power of the legislature.''

To the same effect are the following authorities: State, ex rel v. Superior Court, 67 Wash. 37; Home Telephone Co. v. Los Angeles, 211 U. S. 271; Munn v. Illinois, 94 U. S. 113; M. S. P. & Ste. M. Ry. Co v Menesha & W. W. Co., 159 Wis. 130; Douglas v. Commonwealth, 100 Ky. 163.

An instructive case on the question under consideration is that of State v. Martin, 82 Neb. 225, 23 L. R. A. (N. S.) 217. It appears that the railroad company had a continuing contract with Martin by which for $25.00 per month and an annual pass, he was to render to its injured employees professional services as required by

the railroad company. After the passage by the legislature of an Anti-Pass Law quite similar in terms to the one in Kentucky, Martin sought to enforce his contract and it was held by the Nebraska Supreme Court that he could not do so. It is true the contract was terminable at the will of the railroad company, but the decision of the court was not made to turn upon that fact. The main question presented to the court was whether Martin's contract was within the meaning of the State Anti-Pass Act, and the decision was limited to declaring that he was within the terms of the Anti-Pass Act. In the opinion it is said:

"We come now to dispose of the defendant's second and third contentions, which strike at the constitutionality of the law involved in this controversy. These questions will be considered together, for what may be said as to one of them applies with equal force to the other. It is asserted that the Anti-Pass Law is unconstitutional because it impairs the obligations of the contract existing between the defendant and the railroad company, and deprives defendant of his property without due process of law. To correctly decide this question, we should construe all of the provisions of our constitution and statutes which relate thereto, or have any bearing thereon, together. By section 7 of article II. of the constitution it is provided that 'the legislature shall pass laws to correct abuses, and prevent unjust discrimination and extortion in all charges of express, telegraph, and railroad companies in this state, and enforce such laws by adequate penalties.' It thus appears that the power to regulate intrastate commerce and prevent unjust discrimination is not only granted to the legislative assembly by the constitution, but it is thereby made a duty which the lawmaking body is commanded to perform. It is also well settled that the internal commerce of a state, that is, the commerce wholly confined to and carried on within the limits of a single state, is as much under state control as foreign or interstate commerce is under the control of the general government. Sands v. Manistee River Improvement Co., 123 U. S. 293; Gibbons v. Ogden, 9 Wheat. 19; Covington & C. Bridge Co. v. Kentucky, 154 U. S. 210, 4 Inters. Com. Rep. 649; Geer v. Connecticut, 161 U. S. 519. The exercise of this power necessarily includes the rights to interfere with contract and property rights, so far, at

least, as may be necessary to prevent extortion and discrimination. From even a cursory examination of the several acts of our legislature on this subject, it is quite apparent that the contract under consideration was, and is, discriminatory in its nature. We find that like contracts have been frequently declared to be so. The statutes of North Carolina upon this subject are the same as our own, and, in Neill v. Durham & C. R. Co., 132 N. C. 510, it was held that a contract between a railroad company and the publisher of a newspaper, by which he was to publish the time-tables of the company, and receive a pass over its line of railroad as compensation therefor, was invalid, and was an illegal discrimination. . . . . This decision not only meets with our approval, but we find that the federal courts, in construing like provision of the Interstate Commerce law, have reached a similar conclusion. United States v. Wells-Fargo Exp. Co., 161 Fed. 606. *Again, it may be said, if the contract for the pass, in the case at bar ever had any validity, the provisions of our constitution above quoted, entered into and became a part of it at its inception. And its terms and obligations were at all times subject to the power of the legislature to pass laws 'to correct abuses and prevent unjust discriminations.' Therefore, when the law in question took effect, the contract became illegal, and its obligations gave way and were suspended, for it cannot be said that it was of such a character as to suspend the provisions of the constitution and the statute passed in response to the command of that instrument.''*.

"It may be further stated that our Anti-Pass Law is simply a police regulation, adopted in pursuance to the mandates of the supreme law, and, therefore, cannot be said to be unconstitutional. In Tiedeman on Limitations of Police Power it is well said (Section 93, p. 233): 'Whenever the business is itself a privilege or franchise not enjoyed by all alike, or the business is materially benefited by the gift by the state of some special privileges to be enjoyed in connection with it, the business ceases to be strictly private, and becomes a *quasi* public business, and, to that extent, may be subjected to police regulation.' That such is the nature of the business of a common carrier there can be no doubt. In Bullard v. Northern P. R. Co., 10 Mont. 168, it was held that 'existing contracts for special freight rates, or re-

bates from regular tariff rates which had been made with the railroad companies subject to the interstate commerce act, became illegal when that act took effect, and were after that time incapable of enforcement.' The contract in question herein is without doubt subject to the same rule. We are, therefore, of opinion that the issuance of the defendant's annual pass, and its acceptance and use by him, was a plain violation of the statute.''

We have no doubt of the soundness of the conclusions expressed in the opinion, *supra*. As well argued by counsel for appellant, if one should make a contract with a railroad company by the terms of which he conveyed a right of way over certain coal property in consideration that the railroad company would transport all coal mined by him at his mine from the mine to Louisville free of charge when others were charged a dollar per ton for the same service, could it be successfully contended that the state could not declare such a contract discriminatory and void?

There is no difference in principle between the supposed contract and the one we here have under consideration. After all is said, the Anti-Pass Law is nothing more than a law regulating the rates to be charged by railroads for passenger transportation, and while we have in this state no law prescribing the maximum rates to be charged for the transportation of passengers, it is undoubtedly the law as declared by the courts everywhere in this country, that such acts are valid, unless the rates prescribed by them are so low as to amount to confiscation. The Anti-Pass Law does not attempt to prescribe the rate to be charged for the transportation of passengers, but it does declare that it shall be uniform and that all transportation shall be paid for in money. As it is a law intended to regulate the transportation of passengers and prevent discrimination, no doubt can be entertained of its being a valid exercise of the police power of the state required by a mandate of its own constitution, the enforcement of which will not be violative of the Constitution of the United States.

The evils that have resulted in this state and elsewhere from the use of passes are well known and have long been deplored; and it is the purpose of the Anti-Pass Act to make their recurrence impossible. That its

enforcement may in a few instances effect the abrogation of contracts like that here involved, which are not in themselves hurtful to the public, is to be expected, but such exceptional hardships will appear insignificant when compared with the salutary effects that will inevitably result from the application and enforcement of its provisions.

Whether appellees have a remedy for the loss that may result to them from the abrogation of their contract with appellant is not now decided, as that question is not before us. It is our conclusion that appellees were not entitled to the relief granted them by the circuit court.

Wherefore, the judgment is reversed and cause remanded with direction to set aside the judgment, dissolve the injunction, overrule the demurrer to the answer and dismiss the action.

The whole court sitting.