HAWKEYE PORTLAND CEMENT COMPANY, Appellant, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellee.

**CARRIERS: Rates—Special Rate for New Industry—Unallowable Discrimination.** A contract between a carrier and a shipper (owner of an assumed new industry) for a special freight rate is nonenforcible (1) when the amount of traffic is wholly indefinite, and (2) when the amount of traffic is definite, but the contract is not approved by the board of railroad commissioners. (Sec. 8062, Code of 1924.)

**CARRIERS: Rates—Sovereign Power of Government.** Contracts between shippers and carriers for special freight rates (under the New Industry Act) are subject to the regulatory powers of the state and Federal governments over rates.

*Appeal from Polk District Court.*—HUBERT UTTERBACK, Judge.

DECEMBER 11, 1924.

ACTION at law, in which plaintiff seeks to recover from the defendant certain alleged overpayments on freight shipments by plaintiff from its quarry near Earlham, Iowa, to its plant at Des Moines, over the defendant's railroad. The material facts are stated in the opinion. To the answer of the defendant, plaintiff filed a demurrer, which was overruled; and, plaintiff having elected to stand upon the pleadings, judgment for costs was entered in favor of the defendant. Plaintiff appeals.—*Affirmed.*

*Parrish, Cohen, Guthrie & Watters* and *L. F. Crofoot,* for appellant.

*W. F. Dickinson, J. G. Gamble,* and *R. L. Read,* for appellee.

DE GRAFF, J.—This appeal presents no controversy as to the facts, since the demurrer admits the well pleaded averments. Certain questions of law are involved, arising from the allegations of the answer to which the demurrer of plaintiff was inter-

posed. We deem it unnecessary to make answer to all of the matters submitted to the trial court for decision, and will, therefore, give our attention to the legal propositions which are primary and controlling. Before discussing the law of the case, it is necessary to outline briefly the allegations contained in the pleadings.

The plaintiff-appellant is a corporation engaged in the business of manufacturing and selling Portland cement, with its principal place of business at Des Moines. The defendant is a corporation engaged in business as a common carrier by railroad.

On May 20, 1907, appellant's predecessor and the appellee entered into a contract for a special rate on shipments of rock and shale between Earlham, Iowa, where plaintiff's quarry was located, and Des Moines, where its plant was located. This contract called for a rate ''of 20 cents per ton of two thousand pounds each'' on crushed and quarried stone and shale, or either, to be used by plaintiff in the manufacture and production of Portland cement, and for no other purpose. It was further provided that, during the first year after the plant was completed, not less than 3,000 cars of said materials should be transported to its factory over the lines of the defendant railroad company, and for each and every year thereafter, not less than 7,000 cars per year of such material, during the life of the contract or any extension thereof. The terms of the contract were binding upon the parties thereto for ten years from the date of the completion and initial operation of the plaintiff's plant, with the proviso that the agreement could be extended for an additional term of ten years after the termination of the contract, at the option of the plaintiff, by serving written notice of its election so to do, at least six months prior to the expiration thereof. The agreement was made subject to the approval of the board of railroad commissioners of the state of Iowa, and under and by virtue of the terms and conditions of Section 2146 of the Code of 1897, and should be binding upon the parties, upon the approval by the said board of railroad commissioners. It was so approved in the first instance. The original period defined by the contract expired in 1920, and subsequent thereto, there was no resubmission of the contract to the board of railroad commissioners, nor subsequent approval thereof by the

board. During the period between November 15, 1920, and February 4, 1921, plaintiff shipped large quantities of shale and rock between the initial and terminal points, as fixed by the contract, over the defendant railroad, for which the plaintiff was required to pay freight at the established rate of 35 cents per ton; and it is the difference between the contract rate and the actual rate collected on these shipments that constitutes the amount sought to be recovered in this action, to wit: $11,032.

Defendant in answer alleged that the rate collected upon the shipments in controversy was the rate established by law, or pursuant to law, for the transportation of such commodities, and the rate which shippers were required to pay for such service; and further pleaded that the alleged contract was not legally enforcible, for the following reasons:

1. That the rate specified in said contract is discriminatory, and its application to the shipments of the appellant would result in an undue preference and advantage to the appellant, contrary to the statutes of the state of Iowa in such cases made and provided.

2. That appellee is not authorized to grant to the appellant a special rate for the transportation of its shale and rock, because the appellant was not, at the times involved in this case, and is not now, a new industry within the state, within the meaning of the statutes of this state.

3. That the said alleged contract was not, at the times involved in this case, enforcible, because it is contrary to the public policy of the state, as expressed in the statutes of the state, and particularly Sections 2124 to 2146, inclusive, of the Code of 1897, as amended, and for the further reason that the said contract does not comply with the terms of the proviso of Section 2146, in that the rate specified therein is not made applicable to any agreed number of carloads.

4. That the rate specified in said contract had not been approved by the board of railroad commissioners of Iowa, as applicable to the period involved in this action.

5. That, by virtue of the exercise of the powers in him vested by the Federal Control Act of March 21, 1918, the president of the United States initiated rates on shale and rock, such rate for the distance of shipments involved in this action being

25 cents per ton, which rate was, by the terms of Section 208-a of the Transportation Act of February, 1920, continued in force until changed by the board of railroad commissioners of the state of Iowa; that said board on, to wit, August 17, 1920, changed said rate by adding thereto 35 per cent thereof, and that such acts have superseded and rendered null and void the instrument or alleged contract counted on by appellant.

6. That the railway line of the appellee is an instrumentality of interstate commerce, and is devoted to such use simultaneously with the conduct of its business as a common carrier of intrastate commerce. That the duty was imposed by the provisions of Section 15-a of the Transportation Act upon the interstate commerce commission, to fix just and reasonable rates, which would yield a fair return upon the fair value of the property of common carriers engaged in interstate commerce; and in order so to do, the whole business of such interstate instrumentalities must be given consideration; and if the rate specified in said alleged contract was enforced, it would constitute a discrimination against interstate commerce, in that interstate commerce would have to bear a greater and undue and unreasonable proportion of the burden of producing such fair return; that the interstate commerce commission, in the exercise of its power in the premises, determined that rates in the rate group within which the property of the appellee is situated, should be increased 35 per cent, in order that the aggregate of the revenues should meet the duty imposed by said act, and that, pursuant to such determination, the board of railroad commissioners of the state of Iowa did enter its order, on, to wit, August 17, 1920, increasing the rates on shale and rock, as applicable to the shipments involved in this action, by 35 per cent, and that such acts and action superseded the said alleged contract.

7. That the said rate so specified in said alleged contract results in the giving to the appellant an undue preference, and that such rate has in fact been revoked by the subsequent action of the board of railroad commissioners of the state of Iowa, authorizing an increase in the rate on such commodity.

To these matters as pleaded in the answer, plaintiff demurred; and with the correctness of the ruling of the trial court in overruling the demurrer, this appeal is concerned. Two pri-

mary propositions are involved: (1) Does the contract in question grant a special rate for a common carrier's service, contrary to the provisions of the statutes of this state, and therefore void? (2) Was the contract subject to the regulatory power of the state and the Federal government over rates for public service; and were the appellant's rights to enjoy special contract rates lawfully terminated by the exercise of this power? An affirmative answer to either of these questions works an affirmance of the judgment entered by the trial court.

I. Appellant asserts a right to a special privilege under its contract with a common carrier, and the burden is upon the appellant to bring itself within the provisions of the statute upon which the special rate of carriage is predicated. The statute provides:

1. CARRIERS: rates: special rate for new industry: unallowable discrimination.

"But for the protection and development of any new industry within the state, such railway company may grant concessions or special rates for any agreed number of carloads, which rates shall first be approved by the board of commissioners, and a copy thereof filed in its office." Section 2146, Code of 1897.

It is the plain intent of the provisions of our Code to prohibit the granting of discriminatory rates. Sections 2124 to 2146, Code of 1897. These statutes recognize that it is not the proper business of a common carrier to foster particular enterprises or to build up new industries, and that the carrier is bound to deal fairly and impartially with the public, and to place all patrons upon the plane of absolute equality. *Central Tr. Co. v. Chicago, R. I. & P. R. Co.*, 156 Iowa 104. The exception to the general rule and the plain intent of the statute is in the thought that the special rate may be extended to a "new industry," and for an "agreed number of carloads." A new industry may be considered as one that does not have an established business, and which "is struggling for existence, experimenting, hoping." *United States v. Browniley,* 58 Fed. 554. Conceding that, when the contract in question was executed, plaintiff's business was classifiable as a new industry, it may be seriously questioned, under the averments, that, at the expiration of ten years, the business of plaintiff may be so classified. It had thoroughly established itself as a successful institution, had

earned large sums of money in the conduct of its business, and had reached such a stage of development that it could no longer be said to be an experiment. We do not, however, consider this question decisive of the matter. An examination of the pleaded contract discloses that there was no limitation on the number of carloads subject to the special rate, unless the minimum fixed brings the contract within the intent of the statute. Under its terms, the contract is enforcible with the special rate for any number of cars in excess of the minimum. We are not privileged to read into the statute an exception not found therein. The rights and powers conferred by the statute applicable to the facts herein can only be exercised in strict conformity with the letter and spirit of the act. It is well defined that statutes intended for public benefit are to be taken most strongly against those who claim rights or powers under them, and most favorably to the public. *Camden & A. R. & T. Co. v. Briggs,* 22 N. J. L. 623, 625; *Garrigus v. Board of Com.,* 39 Ind. 66.

In the instant case, the language of the statute is plain and unambiguous. There is no occasion to invoke a rule of statutory construction. The proviso in question creates special exceptions, and those who claim the exception must establish it as being within the words, as well as the reason thereof. *Baltimore & O. S. W. R. Co. v. United States,* 242 Fed. 420, at 423; *United States v. Dickson,* 15 Pet. (U. S.) 141, 165 (10 L. Ed. 689); *Ryan v. Carter,* 93 U. S. 78, 83 (23 L. Ed. 807); *Schlemmer v. Buffalo R. & P. R. Co.,* 205 U. S. 1, 10 (27 Sup. Ct. Rep. 407, 51 L. Ed. 681); *United States v. Trinity & B. V. R. Co.,* 211 Fed. 448, at 453 (128 C. C. A. 120).

It has been frequently held that a proviso must be considered strictly, and does not take a case out of the enacting clause which does not fall fairly within its terms. We conclude, therefore, that the instant contract, as measured by its terms, is not strictly within the terms of the statute upon which appellant relies for its right to special privilege. It may be said further that the only definite rates submitted to the board of railroad commissioners for their approval were rates upon an indefinite quantity of traffic for a period of ten years, which, upon expiration of that period, were not approved by the board. These

were conditions precedent for the granting, or a claim under the grant, for special rates or privileges.

II. Are the terms of the contract in suit subject to the exercise of the regulatory power of the state and the Federal government over rates for public service? The instant contract was not made by the state, or by an agency of the state. It was a contract for a special rate between a carrier and a shipper. It is well defined that every rate lawfully collected by a common carrier is one charged pursuant to legislative authority. In *Minneapolis, St. P. & S. S. M. R. Co. v. Menasha Wooden Ware Co.,* 159 Wis. 130 (150 N. W. 411), it is said:

2. CARRIERS: rates: sovereign power of government.

"It has been uniformly held by the Supreme Court of the United States that contracts between private parties and common carriers fixing compensation to be paid for transportation, though made under state or Federal authority, are made subject to the right of the state or of Congress to modify or annul them under their sovereign power to regulate rates."

The change of rates in the instant case resulted from war conditions. Under the Federal Control Act of March 21, 1918, the president of the United States assumed the operation and control of the railroads of the United States, and under the terms thereof, the president, through lawfully constituted agency, was authorized to initiate rates. Shortly thereafter, the rates were generally advanced by the Federal director of railroads, 25 per cent. At this time, intrastate rates in Iowa were advanced, simultaneously with the interstate rates. These rates remained effective, with some modification, until the railroads were returned to private operation and control, under the terms of the Transportation Act of February, 1920.

Section 208-a of the Transportation Act in terms continued said rates in effect until they should be changed by competent authority. The Transportation Act also directed the interstate commerce commission to fix such rates as would, in their judgment, provide a reasonable return upon the value of the railroad properties used in transportation.

In the case known as *Ex-Parte 74* (58 I. C. C. 220 and 302), after exhaustive hearings, the interstate commerce commission decided that rates generally in the United States should be ad-

vanced. In the rate territory of which the state of Iowa forms a part, it was determined that this rate of increase should be 35 per cent. The board of railroad commissioners of the state of Iowa, after hearing on August 17, 1920, concurred with the interstate commerce commission, making an order advancing the Iowa intrastate rates also 35 per cent. All of the evidence taken by the interstate commerce commission was filed as a part of the evidence before the Iowa railroad commission. The Iowa board, in its order of August 17, 1920, said:

"The carriers may issue tariffs effective August 26, 1920, providing for an advance on the Iowa schedule of rates and charges as fixed by this commission, of twenty-five (25%) per cent, plus thirty-five (35%) per cent, subject to present rule as to minimum scale; that on and after September 1, 1920, the said schedules shall be subject to Iowa Classification No. 15, with amendments,"—and fixed a minimum class scale. "That a thirty-five (35%) per cent advance may be added to the current Iowa commodity rates, except as otherwise provided herein."

Exceptions were made as to soft coal, excess baggage, milk, and cream, and the rates applying on sand, gravel, stone, shale, etc., upon which latter items the board said:

"That a thirty-five (35%) per cent advance may be made in the current rates on these commodities, but that on and after September 1, 1920, the carriers shall apply Item 78 of Iowa Classification No. 15, page 173, as to rates, and upon the items as appear in Index 71, Supplement No. 16 to Iowa Classification No. 15, plus twenty-five (25%) per cent, plus thirty-five (35%) per cent advance." Report of Iowa Railroad Commissioners, 1920, pages 51, 53.

Item 78, page 173, of Iowa Classification No. 15, names the commodity rates applying on stone, sand, gravel, clay, and shale, in effect at the time the Federal government assumed control and operation of the railroads. The items appearing in Index 71, Supplement No. 16 to Iowa Classification No. 15, renames the commodities as follows:

"Stone (all kinds, including rough or dressed, not polished, lettered or figured), rough quarried or crushed, gypsum rock,

sand, gravel, burnt earth, coal cinders or clinkers, crushed brick or crushed tile, clay and shale, min. C. L. weight 30,000 lbs.''

While the board of railroad commissioners made no specific mention, in its order of August 17, 1920, of the contract rates brought into question in this proceeding, neither did it exempt such rates from the 25 per cent, plus the 35 per cent advance, granted on all other rates, with the few exceptions noted.

The validity of the acts in question cannot be impeached. The Supreme Court of the United States has affirmed the constitutionality of the Transportation Act. *Railroad Comm. v. Chicago, B. & Q. R. Co.*, 257 U. S. 563 (66 L. Ed. 371) ; *Dayton-Goose Creek R. Co. v. United States*, 263 U. S. 586 (68 L. Ed. 216). It may further be said that, at the time of the decision in *Ex-Parte 74*, the interstate commerce commission contemplated that an increase would be made in state rates, equal to that which it accorded in interstate charges, in order that the return from the transportation business, interstate and intrastate, would equal the measure defined by the Transportation Act of 1920. This is quite apparent from the decisions. See 62 I. C. C. 440; *Dayton-Goose Creek R. Co. v. United States,* supra. In the latter case, it is said:

''The new act [Transportion Act] seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. * * * It is insisted here that the power to regulate interstate commerce is limited to the fixing of reasonable rates and the prevention of those which are discriminatory, and that, when these objects are obtained, the power of regulation is exhausted. This is too narrow a view of the commerce clause. To regulate in the sense intended is to foster, protect, and control commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety.''

It is quite apparent, both from the act itself and the decisions of the commission and of the Federal courts, that, if the rates maintained in any given state as a whole, or upon any

particular class or commodity, were insufficient to bear a proper proportionate part of the cost of transportation, including a fair return upon the fair value of the property devoted thereto, then the transportation systems as a whole would not be permitted to earn what Congress determined was just and reasonable. It is the duty of both Federal and state agencies to. enforce the provisions of Federal statutes; and the state of Iowa, sensing this obligation, made its intrastate rates conform to the general scheme. It was simply a recognition that certain increases in rates were necessary, in order to comply with the standard or measure directed by the terms of the Transportation Act. To effectuate this purpose, it was within the province of the board of railroad commissioners of the state of Iowa to take such action as would prevent the existence of an unlawful discrimination against interstate commerce, and this was done by an increase of intrastate rates in conformity to the action previously taken by lawfully constituted Federal agencies. The overruling of the demurrer was clearly correct.

Wherefore, the judgment entered is—*Affirmed*.

All the justices concur.