**SHAFFER OIL & REFINING CO. v. CREEK COUNTY GAS CO. et al.**

No. 15144—Opinion Filed Jan. 12. 1926.

Rehearing Denied May 18, 1926.

(Syllabus.)

1. **Corporation Commission—Appeal — Presumption of Correctness of Orders.**

This court has jurisdiction on appeal from orders of the Corporation Commission by reason of the provisions of section 22 of article 9. Williams' Constitution of the state, and by reason of that part of said section which

is: "The Supreme Court shall have jurisdiction on such appeal to consider and determine the reasonableness and justness of the action of the Commission appealed from, as well as any other matter arising under such appeal; provided, however, that the action of the Commission appealed from shall be regarded as prima facie just, reasonable, and correct. * * *" Unless this court, on consideration of the principles of law governing the determination of the questions to be passed upon on such an appeal, can reach the conclusion that the prima facie correctness of the order of the Commission is overcome and same is either unreasonable or unjust, this court will not reverse the order of the Commission.

**2.  Gas—Public Utilities—Liability of Consumer Under Rate Fixed by Agreement Under Unusual Conditions.**

Chapter 93, Session Acts Legislature of Oklahoma, 1913, is an exercise of legislative authority expressly granted the Legislature by section 19 of article 9 of the Constitution, and that part thereof which provides: "The Commission may be vested with such additional powers, and charged with such other duties (not inconsistent with this Constitution) as may be prescribed by law, in connection with the visitation, regulation, or control of corporations, or with the prescribing and enforcing of rates and charges to be observed in the conduct of any business where the state has the right to prescribe the rates and charges in connection therewith. * * *" This chapter delegates jurisdiction, which the state could otherwise exercise, to the Corporation Commission to fix and establish rates and regulations to be charged by public utilities therein mentioned and enumerated. This jurisdiction cannot be defeated by a public utility and a person or corporation entering into a contract whereby the utility agrees to render the service it is engaged in rendering at a stipulated price. But, where a natural gas utility, in order to render the service, is required from time to time to extend its facilities to other fields at a large expenditure of money in order to bring gas in competition with other fuels, and the said Commission, exercising as above set out the authority otherwise reserved in the state, enters an order permitting such utility to make such arrangements as it may see fit to bring the products furnished by it in competition with other fuels, and it, in fact, makes a contract with an industrial consumer under such permissive authority, and it and the consumer voluntarily agree upon a rate which induces the utility to expend a large sum of money to furnish the consumer what its industry demands, and the consumer voluntarily pays the contract rate without coercion on the part of the utility upon bills or statements rendered monthly, thereby saving to itself a large amount of money. such consumer cannot recover back the rate so paid to the utility, such consumer knowing other industries paid a less rate. This, however, does not prevent the consumer applying to the Corporation Commission to make such order as the facts warrant touching future rates.

**3.  Same—Consumer not Entitled to Rebate.**

The record in the instant case examined, and held, that the findings and order of the Corporation Commission herein refusing to order the rebate prayed are neither unreasonable nor unjust, and that there is nothing presented on this appeal which overturns the prima facie correctness, reasonableness, and justness of such order. and same is affirmed.

Appeal from Corporation Commission.

Complaint before the Corporation Commission by the Shaffer Oil & Refining Company against the Creek County Gas Company. From order of the Commission, the complainant appeals. Affirmed.

Rainey & Flynn, Calvin Jones, Cummins, Roemer & Flynn, and Paul Reiss, for plaintiff in error.

A. Carey Hough and George A Henshaw, for. defendant in error.

BRANSON, V. C. J.   The Shaffer Oil & Refining Company, a Delaware corporation, paid the Creek County Gas Company, a corporation, 20 cents per thousand cubic feet for natural gas, covering a certain period of time; 17 cents per thousand cubic feet for a certain other period of time, and 15 cents per thousand for another period of time. Said varying rates covered part of the year 1920, the year 1921, and part of 1922. The former corporation will be referred to herein as the complainant, and the latter as the respondent. The complainant at all times herein mentioned owned a large oil refinery located at Cushing, Okla. In the operation of this refinery natural gas was the most desirable fuel, if obtainable on a basis sufficiently economical to justify its uses, instead of fuel oil, customarily used in such refineries. The respondent was a public utility within the meaning of the statutes of Oklahoma defining the same. It was financially capable of operating only in a limited territory, and on. a small scale. Its operations were confined almost exclusively to taking the gas from territory or leases owned by the complainant, near Cushing, paying the complainant a well rate therefor. and furnishing the same through its pipe lines to certain industries, to wit, oil refineries, located either at or near the said town of Cushing. The gas so conveyed to the complainant was for its consumption in its said refinery. It furnished gas also

to a refinery owned by the Sinclair Company and one owned by the Pure Oil Company.

The complainant filed its complaint with the Corporation Commission, and in substance set out that the defendant was a utility engaged in the business of transporting, selling, and distributing natural gas to certain oil refineries located in or near Cushing, to wit, those mentioned above, and that the complainant was "by far the largest consumer supplied by and through said respondent." Further, the complainant pleaded that the respondent had been charging for natural gas furnished to it 7 cents per thousand over and above the amount paid by it at the producing wells, whereas it had been furnishing gas to the said other refineries at a considerably less rate. That by so doing, the respondent unjustly and illegally discriminated against the complainant, and that it had never complied with the rules and regulations of the Corporation Commission, and that the rates and prices charged by said respondent for the gas consumed and service rendered complainant have been and are arbitrary rates established and charged by the said respondent. That the said rates were unreasonable and excessive.

Upon these summarized allegations the complainant prayed, first, that the Commission make an order "granting this complainant the same rate for future consumption of gas in its refinery at Cushing as the most favored customer of the said respondent now enjoys for the same service in or near the said city of Cushing; and—

"Second, that an order be made fixing the excess amounts paid by your complainant in the past to the respondent, because of the illegal discrimination practiced against your complainant as hereinbefore specified, and ordering said respondent to immediately refund the amount of said excess payments."

The charge was excessive, as complainant contended, in so far as the rate charged it was above the rate charged the other industries mentioned in its complaint. After hearing duly had, in which the evidence was reduced to a transcript, the Corporation Commission made its findings, on which it based a judgment denying the rebate prayed, and it is this order the Shaffer Oil & Refining Company seeks to have reversed.

There is little dispute in the record as to the controlling facts. The complainant paid on the receipt of monthly bills, the rates varying, as set out, supra. This was by reason of a contract entered into by the complainant, through its duly authorized officers, with the respondent, effective as of October 1, 1920, and supplemented by a contract entered into by its officers duly authorized, sometime the latter part of 1921, This contract resulted from a series of negotiations carried on between the duly constituted representatives of the complainant and the officers of the respondent, covering a period of some five months or more, antedating the said date of the original contract. The negotiations so carried on, which moved the contract in question and constituted a vital part consideration therefor, are made clear by the record, to wit: Said complainant owning, as set out in its pleadings above, by far the largest industry in the vicinity served by this utility, was more than zealous to be reasonably assured of an adequate supply of gas for its refinery for a period of five years or longer. The respondent would have furnished all the gas which it was able to furnish from the gas territory to which its pipe lines were at the time of the negotiations connected, or which the utility had accessible, at the same rate the said utility was furnishing the other industries mentioned under short-term arrangements. The complainant was offered gas by another utility in the same vicinity, known as the Home Gas Company, at a much less rate than that alleged to have been paid to the respondent, but, on account of the supply accessible to the said Home Gas Company, its offer was rejected. The officers and experts of the complainant, after an investigation and negotiations, covering a period of time as above set out, reached the conclusion that it was to its best business interest that the respondent extend its pipe lines to a certain newly discovered gas field, which from investigation would furnish a supply adequate for all consumption for a period of at least five years, and possibly many years longer. This supply was located in Pawnee county, and it required an extension of respondent's pipe lines a distance of 12 miles or more to reach this field, which was known as the Josey field. The gas in this field was being produced in large quantities. It had a large open flow, and a high rock pressure, but the same could not be purchased by the utility at less than 11 cents at the wells, the utility guaranteeing to take 25 per cent. of the open flow. To reach this field, the officers of the complainant knew, would require an expenditure on the part of the respondent of approximately $150,000. The utility was not financially able to do this for the price which it had been receiving for gas taken from gas wells to which its pipe lines were already connected. The evidence discloses that, to induce the utility to expend the

above-mentioned sum of money to reach the said Josey gas field, the contract was executed. Among its various terms was an agreement that the complainant would pay 20 cents per thousand. Later this was supplemented by an agreement to pay 7 cents in addition to the well rate paid by the utility, and that the utility should guarantee an adequate supply to the complainant for a period of five years. The respondent extended its pipe line to the said Josey field in Pawnee county, a distance as aforesaid at the approximate cost aforesaid, entering into an agreement with the owners of such wells to pay the price at the wells above set out, and to take 25 per cent. of the open flow.

The record does not disclose that the conduct of the representatives of the complainant herein was other than that of astute business men, possessed of great foresight and acumen. Without reaching the Josey field, the record shows that it was clear that the gas supply accessible to the complainant's large refinery could only last for a short time. Fuel oil was marketable at the time at approximately $3 per barrel, and not expected to decrease in price within any reasonable time, and certainly not below $2.50 per barrel. The fuel quality of one barrel of fuel oil was approximately the same as 6,000 feet of gas. The gas at 20 cents per thousand, or $1.20 for 6,000 feet, would be worth to the refinery a barrel of fuel oil, o: the market value of $2.50 or $3. The refinery in question had a capacity of 6,500 barrels per day, and the difference between the use of fuel oil and gas at 20 cents, during the period herein mentioned, would run into hundreds of thousands of dollars. In other words, the record discloses that it was clear in the minds of the officers and experts of the complainant that if gas could be had (by extension to the Josey field), this gas would compete to complainant's great financial advantage, at 20 cents per thousand, with fuel oil, and that fact was clearly known to the officers of the complainant at the time of entering into the contract. The record does not fail to disclose, what seems clear to those not possessed of expert knowledge, that gas as a fuel could only be brought in competition with other fuels in event there was a pipe line properly connecting the wells producing gas with the industry to consume it. Howsoever bounteous the supply of gas might be. the same could not be on a competitive basis with other fuels, if the point of production did not have a conveyance in the form of a pipe line to the point of consumption. In other words,

if the gas was not at hand for use, other fuels must be resorted to, whatever might be their cost on the market, or their market value.

The Corporation Commission, effective as of July 20, 1920, had entered an order fixing a minimum rate for the respondent at 18 cents per thousand, in which order, and as an effective part thereof, appeared this clause;

"Provided, however, that the Creek County Gas Company be, and it is hereby authorized to meet the competition of other gas companies in the price at which it distributes its gas, or to meet the competition of dealers in other fuels by such arrangements it may deem proper to make."

Chapter 93, Session Laws of 1913, extended the power and authority of the said Corporation Commission to utilities such as here in question, "with power to fix and establish rates, and to prescribe rules requirements and regulations affecting their services, operation, and the management and conduct of their business." Chapter 10 of the same Session Acts provided that the said Commission should have the power of a court of record to determine:

"First, the amount of refund due in all cases where any public service corporation, person or firm, as defined by the Constitution, charges an amount for any service rendered by such public service corporation, person or firm, in excess of the lawful rate in force at the time such charge was made, or may thereafter be declared to be the legal rate which should have been applied to the service rendered."

Under the authority of the said act first mentioned, the said order, effective as of July 20, 1920, had been entered by the Commission. The terms of this order were known to the complainant and were known to the Creek County Gas Company. The contract and the supplement thereto between the complainant and the respondent show on their face that the refinery had in contemplation the use of gas and fuel oil in the operation of its industry, reserving, as the complainant did, the right to use fuel oil and not comply with the terms of the contract, if at any time the use of fuel oil was deemed to be more advantageous or economical. Each party complied with the terms of the contract, the complainant paying the bills voluntarily as they were rendered each month. the utility never at any time making any threats to discontinue gas service by reason of failure to comply with the terms of the contract, and the amounts as specified in the contract were paid vol-

untarily by the complainant until the complaint herein was filed.

After hearing of the evidence, the Corporation Commission made findings of fact, which, epitomized, are to this effect in so so far as important here:

First, that the rate paid by the complainant was not arbitrary or discriminatory between it and the other industries served.

Second, that the rate was fixed by voluntary agreement between complainant and respondent, after a thorough investigation of the supply of natural gas available in the vicinity, and after the approval of the same by a committee of five experienced and astute business men, representing the complainant.

Third, that the respondent, in consideration of the increase agreed upon in the contract, invested additional amounts in pipe lines, and made extensions to other sources of supply of natural gas, which were not connected prior to such negotiations, the same requiring the expenditure of a large sum of money.

Fourth, that complainant knew of the rate fixed by the Commission, and that it should not be heard to say that it did not know the rate which was being paid for gas sold in quantities as used by it at that time.

Fifth, that the order effective as of July 20, 1920, recognized the right of the Creek County Gas Company to make such arrangements as might seem proper to it in connection with the sale and distribution of gas for industrial consumption in competition with other fuels.

Sixth, that by reason of the contract, the complainant was able to realize a large saving upon fuel used at its refinery, considering the price paid for the gas, with the price of fuel oil, which in the absence of gas it would have used, and which was manufactured by the complainant and sold by it throughout the country.

Eighth, that the contract of complainant and respondent, effective as of October 1, 1920, as later modified by a reduction to 17 cents per thousand cubic feet, is, as to gas supplied and furnished by the respondent company to the complainant prior to the time of filing of this complaint, binding upon the complainant.

All of these findings, in so far as they refer to matters of fact, are well supported by the record. Though shrouded in confusion and inconsistent positions, the contention of the appellant, as disclosed by its briefs, is that any rate charged one consumer greater than a rate charged another similarly situated, is discriminatory, unlawful and unreasonable, and that the Corporation Commission, by virtue of section 3470, C. O. S. 1921, may afterwards declare what the legal rate during the period under consideration should have been for the service rendered by the public utility, and based upon such subsequently ascertained rate, order a refund by the utility of all sums theretofore to it paid in excess of such rate. In various places in its brief it states that such rate should be **reasonable**; in other places in its brief it states that the legal rate (maximum) had already been fixed, by order of October 14, 1918, at 15 cents per thousand, which was effective until July 20, 1920, when it was raised to 18 cents per thousand.

It is therefore not controverted that, at the time of the service rendered by the utility, there were specific rates fixed by the Commission, not as set out in complainant's brief as "maximum," but as a "minimum." So if it is Commission rates that complainant contends for in specific figures, they are to be found in orders of the Commission covering the entire period of time here in question. There is nothing in the record which would have warranted the Commission in fixing smaller rates than those above specified as appearing in the said orders. If it is for a reasonable rate, in disregard of the specific rates fixed by the Commission, that complainant contends for, there is nothing produced by the complainant which would even indicate what such reasonable rates as an independent matter of fact would be, even on the rule of law contended for by it, to wit, that rates must be based upon the investment and the expense of operating the utility. So, on these grounds, the prayer of the complainant cannot be granted.

But if we are correct as to the contention of complainant, it divides itself into two parts: (a) That a rate paid by one customer greater than that paid by another customer similarly situated is discriminatory, unlawful, and unreasonable; (b) that the Commission may, subsequent to the payment thereof, declare what the legal rate should have been, and order a refund of the amount paid in excess.

The first (a) merely announces the principle of the common law, which rule of the common law was to the effect that whenever private property was devoted to a public use, it became subject to regulation by the body politic in the interest of a just and reasonable charge to all persons **similarly** situated, and anything in excess thereof could be re-

covered in a proper proceeding. But this principle was not one in which any person had a vested right or interest, for such rule of law was subject at all times to be changed by the power of the Legislature.

If the question that the utility is required by the common-law rules to furnish the same service to its customers **similarly** situated, at the same rate, were the only one involved in this controversy, it could be settled with clarity and ease by the authorities cited by the appellant, to wit: A. & V. R. R. Co. v. R. R. Com. (Miss.) 38 South. 356; 203 U. S. 496; Messenger v. Penn. R. R. Co., 36 N. J. 407; Western Union Telegraph Co. v. Call Publishing Co., 181 U. S. 92, and others.

But these go only to a discussion of the principle conceded above. They do not either deal with facts similar or from which a logical analogy can be drawn, to make the deductions in said cases applicable to the situation presented here. In other words, the rules of law announced in these cases are not in dispute.

We therefore pass to the above designated contention (b), to the effect that the Commission, subsequent to the charge of the rates complained of, should have fixed a so-called legal rate, and ordered a refund. Complainant's argument seems to assume that, as a customer of the respondent, it received the same service, and was **similarly** situated to the Pure and the Sinclair industries, likewise served. Its argument further proceeds upon the assumption that the interpretation as placed by the Commission upon its order effective as of July 20, 1925 was not only erroneous, but entirely without justification.

If the common-law rule, supra, governed, we could not concede that the said two elements, lying at the basis of such rule, existed in the instant case. Whether or not parties are similarly situated, within the meaning of said rule, would necessarily in each case depend upon the facts. At this point, a clear understanding of what was in the minds of the officers of the complainant and the officers of the respondent may be ascertained from the evidence given by the then president of the complainant and the chairman of the board of directors, as to the purpose of the five or more months' negotiations preceding the contract; the circumstances and conditions relative to the gas situation surrounding the industry of the complainant, and the price to be paid therefor. Reduced to narrative form on these particular questions, the evidence of the president of the complainant is:

"My name is C. B. Shaffer. I reside in Chicago. The Shaffer Oil & Refining Company owned a refinery at Cushing, Okla. During the year 1920 I carried on negotiations with the Creek County Gas Company through its president, Mr. Tippett. Negotiations lasted for several months, resulting in a contract with the Shaffer Oil & Refining Company to pay 20 cents per thousand cubic feet, which was later modified to 17 cents per thousand cubic feet. Mr. Moore was in charge of the refinery. He and Mr. Huey made an investigation as to the gas situation pending these negotiations, and reported that gas could be purchased from the Home Gas Company for less than Mr. Tippett wanted in the contract. We talked over the offer of the Home Gas Company (a similar utility in the community of Cushing— our's), and concluded that the Home Gas Company was liable to run out of gas, and that if we did not make a contract with Mr. Tippett, we might have no market for the gas we were producing. (As stated above, the pipe line connections of the respondent were on gas-producing territory owned by the complainant — our's.) Mr. Tippett did not refuse to let us have gas. He stated the way our gas was going, it was getting low, and that in order to secure a supply of gas, certain lines had to be built, which would require a large expenditure, and that if the contract was executed, he would put in a 6-inch line to some territory we were developing about 12 miles away, and that he would also build a line to the Jos y property (a new gas field), in Pawnee county. We felt that these connections would give us an adequate supply of gas, but there was an additional consideration in this: We had gas (meaning on the leases held by the complainant), but the pressure was getting low, so that it could not feed into high pressure lines, and in order to have a market for this gas, Mr. Tippett agreed to bring the gas to the refinery in a low pressure line. Our agreement was entirely voluntary on the part of our company, as we thought it was a business act. At the time of the negotiations, and the contract, myself and my assistants knew that he had short term arrangements with other industries for a less price, to wit, the Pure Oil Company and the Sinclair: we wanted a 5-year contract, or rather, we wanted an adequate supply of gas; an adequate supply of gas is what we were looking for. Gas at 20 cents per thousand was cheaper than to use fuel oil at what we were selling it for. Mr. Tippett was willing to go on and furnish us gas, as he was then situated, as long as he had it. He was not willing to make the expenditure for the extensions to new fields without a contract: the whole interest of the company at that time was to get an adequate supply of gas; as we could see from the way our wells were going, we would not have a supply for our refinery in our own acreage. I think the negotiations which led up to the contract

were begun with Mr. Moore (the manager of the refinery—our's) and myself. When I refer to Mr. Tippett, I refer to him as speaking for and as president of the Creek County Gas Company. Mr. Moore advised me that gas could be purchased from the Home Gas Company at a much lower rate, and I told him if it was advantageous to the refinery to get the gas from them, to do so. Mr. Huey and I talked about it, and agreed that we could not gather up the gas needed as cheap as we were buying it. We felt it was to the advantage of our refinery to enter into the contract in question, and that it was a business proposition. In order that he might insure us a supply of gas for any considerable length of time, it was necessary for him to lay a high pressure line to the Josey wells in Pawnee county. Josey had a lot of gas, and Mr. Tippett agreed that he would put in a 6-inch line to the Josey wells, and further, as we were drilling on the Sharum farm (about 12 miles away), it was agreed that if we found gas out there, he would put in a 6-inch line to the Sharum well. If we found gas there, we wanted an outlet for it, and this would furnish a market. The motive prompting us in entering into the contract was to insure the Shaffer Oil & Refining Company's refinery an adequate supply of gas for a considerable period of time; 5 years or more. We knew that Mr. Tippett was selling gas to other refiners at the time, at 14 cents. I think that at the time the contract was entered into, there was a rate established by the Commission at either 15 or 18 cents. The contract in question was executed on behalf of the Shaffer Oil & Refining Company by Mr. Huey, its vice president. We had a board, composed of five members, who had to pass on all such matters. The Shaffer Oil & Refining Company was worth 20 to 25 million dollars."

The evidence of the chairman of the board of directors of the complainant, on the same questions, reduced to narrative form, is:

"When we began to analyze the operating conditions of the Shaffer Company, we became conversant with the contract between the Shaffer Oil & Refining Company and the Creek County Gas Company, and we were confronted with the fact that we were paying more for our gas than we had reason to believe other customers were paying for gas; and we began at that time an endeavor to get the contract modified. We acquired all the information which it was possible to obtain regarding methods, costs, etc., and it was through these investigations that I acquired my information relative to the purchase and sale of natural gas between the two companies. It was subsequent to August, 1919, that Mr. Huey, after conferences, took charge of looking into the question of our relations with the Creek County Natural Gas Company, and just what date he began, I really do not remember. As a result of these investigations, the contract in controversy was consummated."

Taking the testimony of these head officials of the complainant, we think that findings Nos. 2, 3, 4, 6, and 7 are supported, and that the conclusion in findings 8, 5, and 1 are neither unreasonable nor unjust, nor beyond the pale of the law, subject to what is hereinafter said.

It must be kept in mind that the only matter here presented is the failure of the Commission to order the respondent to rebate the complainant as prayed. The situation of industries such as here involved may not be similar, but, on the contrary, very dissimilar, by virtue of the ambitious wants of those in control thereof, and the service rendered may likewise be different. But we do not deem it imperative to point out at further length that these industries, by reason of the voluntary acts of the parties, were not in such a similar situation, and furnished such similar service that even if the rule, supra, was controlling, it would be reasonable and just to reverse the Commission.

As stated above, the common-law rule is subject to alteration by statute. The Constitution and statutes of this state have placed the regulation of such utilities in the Corporation Commission. Their orders are as legislative and effective as legislative enactments. It cannot be lost sight of that in fixing the rates governing the utility, the Commission specifically authorized arrangements to be made which would bring gas into competition with other fuels. The record in the case shows that an adequate supply of gas was sought by the complainant through the respondent. It cannot be questioned that for months the complainant's officers knew that the available supply of gas was of only short duration; that the big field in Pawnee county would serve no useful purpose to bring it in competition with fuels it might otherwise be required to use, unless a pipe line were built and connected with such wells. They knew, approximately, what it would cost to build such line. It was with the understanding that such line would be built that they preferred, as a business proposition, the arrangement actually entered into, to that proffered by the Home Gas Company, which had only a limited supply, but could furnish gas at a much less rate than that mentioned in the contract. It is charged and not denied that by this arrangement the Shaffer Company saved several hundred thousand dollars. It is only common understanding that

commodities which are furnished by utilities such as involved here are furnished on competitive basis, and at a reasonable cost, primarily, for the benefit of the consumers. There is no public policy involved in any question relative to a utility, except as it affects those served. And its rights, as of eminent domain, are granted by the state, and used by it with the reserved authority of the state, to impose such regulations as either the body politic or the agency created by the body politic sees fit to impose upon the same.

In the instant case, both the complainant and the defendant knew of the order effective as of July 20, 1920, which permitted arrangements by the Creek County Gas Company to bring gas in competition with other fuels. This permissive part of the order must have been framed with the knowledge that if gas was to be transported by the utility to the consumer, it must be in pipe lines; that it must be so transported in order to be brought in competition with fuels which might already be accessible to the consumer; that if the gas already accessible to the utility became exhausted, pipe lines would have to be laid to other fields, and that the cost thereof would have to be paid by the utility, and that, having this additional burden of cost, it would not be reasonable that the utility could incur the same at the same rate that the Commission had deemed a reasonable price for gas furnished from the field to which the lines of the utility were already connected. Therefore, we can see neither force, reason, nor justice in the verbose contention of appellant that a rate in excess of that prescribed would be violative of the spirit of the order, and therefore illegal, which rate was agreed upon by the parties without any coercion for the purpose of bringing gas in competition with fuel oil, by extending a pipe line at a cost incurred by respondent.

We feel that it cannot be argued with reason that it was not under this permissive order of the Corporation Commission that both corporations were negotiating. The Shaffer industry was the largest by far in the community. It knew of the short term arrangements with other industries, and knew that under the principle of law now contended for by it, these industries would have to be served at the rate or at such other rate as the Corporation Commission might order, and it considered that the advantage to itself in securing this added supply would warrant the increased price of gas as a business proposition. It also knew (for it was advised by able counsel) that the Corpora-

tion Commission had jurisdiction at all times to adjust the rates, so as to make them equitable. Acting under this order of July 20, 1920, the arrangement made by it for the purposes in said order set out was with the sanction of the rate-making authority of the state. Moneys paid under the arrangements were parted with, and the fuel received in return therefor, without violating any statute or any order of the Commission, as long as said order was in effect, and the rights of the parties were governed thereby.

This did not preclude, however, the Commission from hearing the complainant on the question of fixing a reasonable or different rate, or modifyng its previous orders. This right of the Commission cannot be stricken down by any contractual relation between the parties. Its right to do so becomes as much a part of each and every such arrangement as if in fact written therein. The power to regulate the rates of such utilities is one inherent in the sovereign, and every contract made as to rates by or with a corporation authorized to contract in reference thereto, is made with the knowledge that the sovereign power of the state can alter the same at its will. In this state the agency of the sovereign to do so is the Corporation Commission. Minneapolis, St, Paul & S. S. & M. Ry. Co. v. Menasha Wooden Ware Co. (Wis.) 150 N. W. 411, and cases there cited; Pinney & Boyle Co. v. Los Angeles Gas & Electric Corporation (Cal.) 141 Pac. 620.

Appellant lays great stress upon its contention that the contract in the instant case was void. In this we only partly agree. It had sanction by reason of the regulatory authority of the state, as it was evidently interpreted by both the appellant and the respondent. Its purpose was to bring gas to the door of the consumers. This could not be violative of public policy. The contract referred to is only void in the sense that it cannot stand against impairment by order made by the Corporation Commission upon its authority being invoked to do so. In other words, the contract falls when the Corporation Commission sees fit to alter the rate or fix a different rate.

Much stress is laid upon the decision of this court in Southern Oil Corporation v. Yale Natural Gas Co., 89 Okla. 121, 214 Pac. 131. The real legal dispute in this decision is found in the first paragraph of the syllabus, which is:

"By chapter 93, Laws 1913, jurisdiction is conferred upon the Corporation Commis-

sion to fix and establish the rates to be charged by the public utilities therein enumerated, and this jurisdiction cannot be defeated by a public service corporation and a private consumer entering into a contract whereby the corporation agrees to furnish its commodity for a term of years at a stipulated rate."

The reasoning of the opinion is in consonance with others above cited on kindred questions, and when properly analyzed is to the effect that such a contractual arrangement can in no wise infringe upon the right of the duly constituted authorities to fix such rate as the facts may demonstrate to be reasonable and just.

But neither this nor any other case cited by counsel, or discovered by research, goes to the point of holding, as appellant contends here, where by an arrangement under permissive authority of the rate-making body, made with a view of bringing natural gas in competition with other fuels, a utility is induced to make large expenditures, by which the consumer expected to and did reap large profits, where the consumer had voluntarily paid the agreed price under such arrangement, that the consumer could then be heard, after the utility had made the expenditures, to claim a return of the moneys voluntarily paid. The arrangement in question was sufficient to induce the expenditure on the part of the utility, and we think it was sufficient to warrant the utility in keeping the extra amount of money paid for the gas delivered and used by the consumer.

This court exercises its jurisdiction in matters of this sort by reason of the Constitution of this state. Part of section 22 of article 9 thereof provides:

"The Supreme Court shall have jurisdiction on such appeal to consider and determine the reasonableness and justness of the action of the Commission appealed from. * * * Provided, however, that the action of the Commission appealed from shall be regarded prima facie just, reasonable, and correct."

The burden is on the appellant in the instant case to show that the order refusing to direct the rebate was neither reasonable nor just. Atchison, Topeka & Pac. Ry. Co. v. State, 28 Okla. 476, 114 Pac. 721. There is nothing in the record that shows either. We think that finding No. 1 of the Commission is justified, and that the rate was neither arbitrary nor, under the facts, was it discriminatory.

We think that findings Nos. 5 and 8 were justified. The interpretation placed upon its order of July 20, 1920, is a reasonable construction thereof. The moneys paid for gas received prior to the time of filing the complaint cannot be recovered by the Shaffer Oil & Refining Company. That as concluded in finding No. 8. We feel, however, that that part of finding No. 8 which goes to the validity of the contract is erroneous, and that the proper holding should have been that arrangements made under the said previous order were subject to such adjustments and change by the Commission as it saw fit to make, under the facts as might be subsequently developed before it.

We think that the complainant is precluded from a recovery herein, not only by reason of the fact that it entered into the arrangement now drawn in question, under the permissive authority of the order of the Corporation Commission, but by the further fact that it induced the respondent to do that from which it expected and did receive a large benefit, and to pay out a large sum of money therefor. Again, under these conditions, having parted with its money, accepting in turn therefor the gas furnished by the respondent, the transaction was closed and it became estopped to make this claim against the respondent. Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467; Chicago, Ind. & L. S. Ry. Co. v. U. S., 219 U. S. 486; Sammons v. Kearney Power & Irrigation Co. et al., 110 N. W. 308; St. Paul, etc., v. Minasha Wooden Ware Co. (Minn.) 150 N. W. 411; Pinney & Boyle Co. v. Los Angeles Gas & Electric Corp. (Cal.) 141 Pac. 620; Raymond Lumber Co. v. Raymond Light & Water Co. (Wash.) 159 Pac. 133.

In the recent case of Roxana Petroleum Co. v. Goldrick et al., 113 Okla. 298, 242 Pac. 228, this court in effect said: Voluntary settlements between parties in respect to their rights, where all have the same knowledge, or means of obtaining knowledge, concerning the circumstances involving their rights, and there are no frauds, misrepresentations, concealments, or other misleading incidents, are so favored that a settlement of their differences must stand and be enforced.

In the above cited case, Minneapolis, St. Paul, S. S. & M. Ry. Co. v. Menasha Wooden Ware Co. (Wis.) 150 N. W. 411, the Supreme Court of Wisconsin considered a case where the Legislature authorized the railroad and its patrons to agree upon rates. Such rate was fixed by contract under such sanction. Later the authorized agency of the state on rate-fixing fixed a different rate—much larger. The fight was over the difference in the contract rate and the sub-

sequently fixed rate for freight hauled for three months after the new rate was made. The contract rate up to the date of fixing the new rate was concluded to be valid, because made under existing legislative sanction; but the new rate was held to prevail after the date it was made.

We think, also, they were estopped. 10 R. C. L. sec. 22; Rothchild v. Title Guarantee & Trust Co., 204 N. Y. 458; St. Louis & S. F. R. Co. v. Gorman, 79 Kan. 643, 100 Pac. 647, and cases therein cited. Affirmed.

HARRISON, MASON, PHELPS, LESTER, HUNT, and CLARK, JJ., concur. NICHOLSON, C. J., not participating. RILEY, J., dissenting.

Note.—See under (1) 28 C. J. p. 561 § 21. (2) 28 C. J. p. 572 § 35. (3) 28 C. J. p. 561 § 21.